FILED

2008 Mar-25  AM 08:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| RODERICK APPLETON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-06-S-1358-NW |
| | ) | |
| TVA BOARD OF DIRECTORS, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Roderick Appleton, filed this action against his employer, the Board of Directors of the Tennessee Valley Authority ("TVA").[1]  His original complaint asserted claims for race discrimination pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); retaliation and sex discrimination pursuant to Title VII; and disability discrimination pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. (the "Rehabilitation Act" or "the Act").[2]  Plaintiff later abandoned his claims for race

---

[1]For cases against the federal government as an employer, "the head of the department, agency, or unit, as appropriate, shall be the defendant."  42 U.S.C. § 2000e-16(c); *see also, e.g., Mullins v. Crowell,* 228 F.3d 1305, 1309 n.8 (11th Cir. 2000) (disability discrimination suit against TVA under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*).

[2]*See* doc. no. 1 (complaint).  Plaintiff's complaint assigned the heading "reprisal" to his retaliation claim, and the heading "handicap discrimination" to his disability discrimination claim. *See id.* at 2-3.

discrimination, retaliation, and sex discrimination.[3]   Defendant has moved for summary judgment on plaintiff's remaining claim for disability discrimination.  Upon consideration of defendant's motion, the parties' briefs, and the evidentiary submissions, the court concludes the motion should be granted.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[3]*See* doc. no. 22 (plaintiff's brief), at 3 ("Appleton does not pursue any claims for race or sex discrimination in these proceedings.").  *See also* defendant's evidentiary submission, Tab 1 (Plaintiff's Response to Defendant's First Interrogatories), at 2 ("Plaintiff no longer makes a claim for retaliation in this proceeding[,] but limits his claims to those involving handicap discrimination directed against him.").

[4] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS

**A.    TVA's Health and Medical Constraint Policies**

The Tennessee Valley Authority ("TVA") is a corporate agency and instrumentality of the Untied States of America and the nation's largest public provider of electrical power.[5] TVA has a written Occupational Health policy stating that it is "committed to protecting the well-being of its employees and others who may be affected by its operations. As a result, it is TVA policy that physical and mental health, adequate for the safe and efficient performance of assigned duties, is a condition of TVA employment."[6] Pursuant to this policy, employees "may be

---

[5] Defendant's evidentiary submission, Tab 5 (Declaration of Dwayne Coffey), at ¶ 2.

[6] Defendant's evidentiary submission, Tab 12 (Exhibit 3 to Deposition of Scott Tiemeyer), at 1.

subject to evaluation to determine their health capacity for safely performing their job duties."[7]   Particularly, evaluations will be required for "[e]mployees who have sustained serious illness or injury which could interfere with their ability to safely perform job duties."[8]   Further, "[e]mployees who are on medical constraints are subject to periodic medical evaluations to review and update medical disposition for duty."[9]

An employee's supervisor or a human resource representative may submit a TVA Form 1444 (Request for Medical Evaluation) to arrange a medical examination for the employee with either an on-site TVA medical examiner or an off-site medical provider who has contracted with TVA to provide medical examinations. The TVA medical examiners or contract physicians are responsible for making the final decision about an employee's "Medical Disposition for Duty," but they may consider the opinions of the employee's personal physician.

> Any additional information required to determine ability to meet minimum standards of TVA jobs beyond that produced in a TVA provided examination must be obtained by employees or applicants for employment from private sources at personal expense. Occupational Health may assist the employee or applicant in obtaining services, but any resulting expenses and followup remain the personal responsibility of the individual. When required by the needs of the agency, TVA *may*

---

[7]*Id.*

[8]*Id.*

[9]*Id.* at 2.

arrange and pay for consultant medical evaluations to determine an employee's continued ability to work safely.[10]

TVA also has a written policy addressing employees' medical constraints. The policy states:

> Medical Constraints (MCs) are special conditions for an individual's work capacity, environment, or facilities necessitated by either health impairments or precaution to prevent injury/impairment and may or may not be work-related. TVA medical examiners apply MCs to inform responsible management that specific accommodations may be required to enable an individual to perform the full range of pertinent job title and special approval duties safely and effectively.

> TVA business units are responsible for determining whether work is available for the employee while the medical constraints are in effect. Supervisors are responsible for discussing any medical constraints with employees to ensure their understanding of the constraints and review the constraints with the employees in relation to their assigned duties.

> MCs are reported to supervisors, human resource managers, and the individual, as appropriate, on form TVA 1444. The TVA medical examiner indicates on the form whether the constraint has a reevaluation date, if the constraint is being removed, or if the constraint is indefinite. If the constraint has a reevaluation date, the TVA medical examiner records the date reevaluation is recommended. It is the supervisor's responsibility to schedule the employee for a follow-up evaluation. If the constraint is indefinite, Occupational Health recommends supervisors review the constraints annually with a TVA medical examiner to determine if reevaluation is necessary.

**Promoting Placement Opportunities for Impaired Individuals**

The consideration and emphasis of an individual's health capacity for a particular job is intended to increase opportunities for safe,

---

[10]*Id.* at 2 (emphasis supplied).

productive employment of significantly impaired persons.    An individual's health capacity and the specific health requirements of the proposed job should be given judicious consideration before MCs are applied.

**Development of MCs**

The medical examiner and appropriate supervisors should maintain close coordination regarding MCs to assure full placement consideration for affected employees.

The supervising organization specifies relevant performance requirements and realistic hazards of the job.

When stringent MCs are imposed or there is some uncertainty about a worker's ability to perform a certain type of work, the medical examiner informs the appropriate HR consultant or supervisor during or immediately after examination to resolve any questions that may arise concerning the person's health status or work capacity.[11]

Dwayne Coffey, the Operations Manager at plaintiff's work site, is "responsible for determining whether there is work available, consistent with" any medical constraints imposed upon the employees under his management.[12]  To make that determination, Coffey considers the following factors, among others: "whether the constraint is permanent or temporary, whether the employee can safely perform the essential functions of their regular position, whether light-duty work is available, whether the constraint has been imposed as a result of an on-the-job injury, and [the]

---

[11]Defendant's evidentiary submission, Tab 13 (Exhibit 6 to Tiemeyer Deposition), at 1 (boldface emphasis in original).

[12]Coffey Declaration, at ¶ 3.

organization's business needs."[13]

## B.   Plaintiff's Work Duties and Position Requirements

Plaintiff, Roderick Appleton, is employed as an Assistant Unit Operator ("AUO") at TVA's Colbert Steam Plant in Colbert County, Alabama.[14]  The Colbert Steam Plant remains in continuous operation and must be staffed with operating employees 365 days a year, except during required maintenance periods.  To satisfy these staffing requirements, operating employees at the Colbert Steam Plant must work seven twelve-hour shifts during a two-week period.[15]  These employees are

---

[13]*Id.*  More specifically, Coffey stated:

> In deciding how to respond to employees with medical constraints, I first consider whether the constraints prevent the employee from performing their job duties.  If the constraints do not prevent the employee from performing their routine job duties, I continue the normal assignment.  For employees with constraints that prevent them from performing their routine duties, I consider whether the constraints are temporary or indefinite and whether they are the result of a work-related injury. For employees with temporary constraints that are the result of a work-related injury, I make adjustments to an employee's job, if possible, to allow them to continue with their routine assignments.  If an employee has indefinite constraints that prevent them from performing their routine job duties, I try to assign light-duty work, particularly if the constraints are the result of a work-related injury.  Employees with constraints that are not due to a work-related injury are the least likely to be assigned light-duty work.  I make greater effort to find light-duty work for employees with constraints resulting from a work-related injury because TVA might otherwise have an obligation with respect to worker's compensation.

Coffey Declaration, at ¶ 6.

[14]*Id.*; defendant's evidentiary submission, Tab 3 (Plaintiff's Response to Defendant's First Request for Admissions), at 2, Response to Request No. 4.  The court could not discern from the record the date on which plaintiff commenced his employment with TVA.

[15]Coffey Declaration, at ¶ 2; defendant's evidentiary submission, Tab 16 (Deposition of Dwayne Coffey), at 71.

compensated with eight hours of built-in overtime pay — billed at one and one-half times their usual hourly rate — every two weeks.  In contrast, employees in non-operating positions work ten standard eight-hour shifts in a two-week period and do not receive any built-in overtime pay.[16]

Plaintiff's job duties as AUO include performing routine inspections and manipulative operations on plant equipment, serving on the plant fire brigade and hazardous material response teams as required, supporting outage activities, participating in preventive and predictive measures, procedure writing, cleaning and maintaining his assigned work area, and training new operators.[17]  TVA publishes a document entitled "General Position Requirements," which describes the duties, environmental requirements, and physical requirements for the AUO position.  The document states that an AUO must be able (among other things) to:  perform work above shoulder height; push, pull, or drag 100 pounds; stand or walk for prolonged periods of time; lift 50 pounds frequently; and lift 75 pounds occasionally.[18]

## C.    Plaintiff's Health Problems and Medical Constraints

Plaintiff suffers from a herniated disc in his neck, cervical spondylosis,[19] and

---

[16]Coffey Deposition, at 71-72; plaintiff's evidentiary submission, Tab 3 (Deposition of Roderick Appleton), at 177-181.

[17]*Id.; see also* defendant's evidentiary submission, at Tab 4 (job description).

[18]Defendant's evidentiary submission, at Tab 4.

[19]One medical dictionary defines "spondylosis" as "dissolution of a vertebra."  *Dorland's*

scoliosis[20] of the thoracic spine due to an on-the-job injury that occurred in March of 1996.[21]   As a result of these conditions, plaintiff has problems driving because he cannot sit in the driver's seat of an automobile for more than two hours without experiencing pain and numbness from his neck to his fingers.   He has difficulty turning his neck to see oncoming traffic when he is attempting to merge into another lane.[22]   Plaintiff also experiences sleep problems.   He cannot sleep more than four hours a night because of neck pain, and he spends his time off work trying to catch up on sleep.[23]   Plaintiff cannot stand in line for more than ten minutes at a time without experiencing neck pain.[24]  He can engage in some sexual activity, but certain sexual positions are prohibited by his neck pain.[25]   He experiences stomach pain, bloating, heartburn, indigestion, hepatitis, and liver problems as a result of taking

---

*Illustrated Medical Dictionary* 1743 (30th ed. 2003).

[20]One medical dictionary defines "scoliosis" as "an appreciable lateral deviation in the normally straight vertical line of the spine." *Dorland's Illustrated Medical Dictionary* 1669 (30th ed. 2003).

[21]Appleton Deposition, at 16; plaintiff's evidentiary submission, Tab 11 (Defendant's Response to Plaintiff's Second Request for Admissions), at 4 (Response to Request No. 10).

[22]Defendant's evidentiary submission, Tab 2 (Plaintiff's Supplemental Response to Defendant's First Interrogatories), at 2; Appleton Deposition, at 19, 34-35.

[23]Plaintiff's Supplemental Response to Defendant's First Interrogatories, at 2; Appleton Deposition, at 19-20.

[24]Plaintiff's Supplemental Response to Defendant's First Interrogatories, at 2; Appleton Deposition, at 35-36.

[25]Plaintiff's Supplemental Response to Defendant's First Interrogatories, at 2; Appleton Deposition, at 20.

Ibuprofen for his neck pain.[26]

Following plaintiff's injury, TVA placed him on indefinite medical constrictions, as recommended by his treating neurologist, including:  no working overhead; no lifting more than 20 pounds; and no pushing or pulling more than 25 pounds.[27]  After these restrictions were imposed, plaintiff began seeing TVA medical examiners on a regular basis.  On each visit to a medical examiner between 1996 and 2004, the examiner continued the restrictions originally imposed by plaintiff's treating neurologist.[28]  During one of these medical examinations — on February 21, 2003 — the examiner, Dr. Gary Daniel, noted that plaintiff had cervical spondylosis and moderate to severe thoracic scoliosis.[29]  Dr. Daniel testified that those conditions are of the type that *could* affect life activities such as lifting, mobility, walking, driving, sleeping, and sexual activity.  Based upon his evaluation of plaintiff, however, Dr. Daniel concluded that plaintiff's conditions did not *actually* have a

---

[26]Plaintiff's Supplemental Response to Defendant's First Interrogatories, at 2; Appleton Deposition, at 39-45.

[27]Plaintiff's Response to Defendant's First Request for Admissions, at 3 (Response to Request No. 5).

[28]Defendant's evidentiary submission, Tabs 14 & 15 (exhibits to Tiemeyer Deposition).

[29]Plaintiff's evidentiary submission, Tab 4 (Deposition of Dr. Gary Daniel), at 9-11.  Dr. Daniel described cervical spondylosis as "a degenerative condition of the neck . . . involving the facet joints where vertebrae . . . connect . . . . [I]t can lead to herniated discs and conditions such as that."  *Id.* at 10.  Dr. Daniel described thoracic scoliosis as an abnormal curvature of the mid-spine. *Id.* at 11.  *See also* defendant's evidentiary submission, Tab 21 (Exhibit 2 to the Deposition of Julia Smith).

substantial effect on those life activities.[30]  Dr. Daniel continued plaintiff's past work restrictions, and he testified that he would not have relaxed the restrictions imposed by a treating physician without consulting that physician.  If Dr. Daniel had felt that any existing restrictions needed to be lifted, he would have requested additional information from the treating physician.  In plaintiff's case, Dr. Daniel had received no request to lift restrictions, and he did not see a need to get additional medical information.[31]

## D.   TVA's Review of Plaintiff's Medical Constraints and Reassignment of Plaintiff

On September 5, 2003, TVA's Senior Vice President over the region encompassing the Colbert Steam Plant sent a memorandum to all management employees in his region, stating:

> A recently completed review of medical restrictions and leave records of [region] employees indicate [sic] the need for improving how we manage and administer these aspects of our business.  Unknown or out-of-date medical information can create a work environment that could endanger the affected employee's ability to work safely and result in new or further injury to the employee or co-workers.  Unexpected absences can cause last minute re-assignment, delay, or cancellation of jobs which reduces efficiency and can affect station operation.

> Medical restrictions of your employees should be reviewed to ensure that they are current and leave records should be reviewed on a

---

[30]Daniel Deposition, at 13-15.

[31]Daniel Deposition, at 33-35.

regular basis.  Your employees should be made aware that these reviews are being performed since some employees may be asked to update or provide information on conditions which may affect their availability to work or their ability to perform work safely.  Also, please ensure that all employees are aware of the attached policy documents and expectations on medical restrictions and leave usage.[32]

The attached policy document concerning medical constraints stated, in pertinent

part:

> Plant management has been directed to update their records regarding employees having medical constraints in support of (1) our objective to ensure that every employee is able to safely perform the essential functions of his-her job and (2) our efforts to ensure a safe workplace for all employees. Supervisors are being held accountable for insuring that medical constraint information on employees under their supervision is available and kept current to ensure that these objectives are met.

**Guidelines:**

> Medical constraint information will be kept current.  Employees are expected to provide a current status of their medical constraints from his/her physician on an annual basis (or sooner if circumstances warrant such) as directed and required by his/her supervisor.  All medical constraint information from a private doctor will be reviewed by a TVA physician.

> Employees with medical constraints will be evaluated periodically to ensure that the restrictions do not conflict with the job duties required to be performed in the employee's position.[33]

In February of 2004, soon after Dewayne Coffey became the Operations

---

[32]Defendant's evidentiary submission, Tab 7 (Declaration of Julia Smith), at ¶ 3; Tab 8 (Exhibit A to Smith Declaration).

[33]Defendant's evidentiary submission, Tab 8 (emphasis in original).

Manager at the Colbert Plant, he began reviewing the medical constrains of all the employees under his management.[34]  Coffey learned that plaintiff had a herniated disc, and he familiarized himself with plaintiff's medical constraints.  However, Coffey did not learn of plaintiff's other medical conditions, he did not review plaintiff's medical file, and he did not discuss plaintiff's medical issues with him.[35] Coffey determined that plaintiff's conditions did not meet the legal definition of a disability, as he understood it.[36]  He nonetheless decided that, unless plaintiff received help from other employees, he would not be able to perform some of the duties of his current job — including "rodding out hoppers,"[37] operating large valves,[38] and isolating feeders[39] — without violating his medical constraints.[40]    Plaintiff

---

[34]Coffey Deposition, at 10-11, 25-26, 34.

[35]*Id.* at 28-32, 47-48.

[36]*Id.* at 47.

[37]Coffey described the process of "rodding a hopper" as follows:

> Hoppers are the large vessels which collect the ash when coal is burned. When the hoppers clog, the dry flay ash operator, such as Mr. Appleton, must rattle a steel or iron rod in the hopper to loosen the clogged ash.  This is referred to as "rodding a hopper."  Since the rods that are used are frequently in excess of 20 pounds, require pushing and pulling, and may exceed 10 to 12 feet in length, Mr. Appleton could not perform that function consistent with his medical constraints.

Coffey Declaration, at ¶ 4.

[38]Plaintiff testified that one of the valves he is required to operate is located overhead, and that he has to pull a chain to open and close the valve.  Plaintiff's evidentiary submission, Tab 3 (Deposition of Roderick Appleton), at 27.

[39]Appleton testified that one of his responsibilities was to "isolate" equipment electrically and mechanically in order to make it safe for maintenance employees to perform work on it.  To accomplish this purpose, he must turn off the equipment and open large valves on the equipment

acknowledged being unable to operate overhead valves, but he maintains that he could perform the other work functions identified by Coffey.[41]

Coffey also became concerned that plaintiff's medical constraints might not be completely accurate, as they had not been updated by his treating physician since 1996.[42]  On July 2, 2004, Coffey presented plaintiff a written memorandum stating:

> You have medical constraints which have not been updated by your private physician since 1996.  Medical constraints reflect issues with your health which need to be reviewed and updated by your doctor with current information.
>
> Attached for your use is a copy of the physical requirements of your position, a current 1444 with your constraints, your position description, and a check sheet for your doctor's use in evaluating your ability to safely perform the essential functions of your position.  Please have your doctor provide the requested information on the check sheet and return to me as soon as possible.
>
> As your manager, it is my responsibility to provide a safe and healthful workplace.  A current medical evaluation is needed to ensure you can safely perform the duties of an Assistant Unit Operator within your current constraints.[43]

Plaintiff attempted to contact the physician who had earlier treated him for his neck injury, but he learned that the doctor no longer maintained an active practice.[44]

---

with a wrench.  Appleton Deposition, at 98-100.

[40]Coffey Deposition, at 20; Coffey Declaration, at ¶ 4.

[41]Appleton Deposition, at 27-28.

[42]Coffey Declaration, at ¶ 5.

[43]Defendant's evidentiary submission, Tab 11 (Exhibit 2 to Tiemeyer Deposition).

[44]Plaintiff's evidentiary submission, Tab 9 (Affidavit of Roderick Appleton), at 1.

Between June of 2004 and February of 2005, plaintiff made repeated efforts to have the worker's compensation file related to his neck injury re-opened so that he would not have to personally pay for a visit to another physician. He tried to enlist Coffey's help in getting the information he needed, but Coffey did not do anything to help him. Plaintiff did not get an appointment with another specialist about his neck until July of 2005.[45]

On October 17, 2004, Coffey reassigned plaintiff to light-duty work as a greeter at the gate house or guard shack.[46] Plaintiff received the same rate of pay in this position that he had received as an AUO. The guard shack, however, was only open eight hours a day, five days a week. Therefore, plaintiff did not continue working rotating twelve-hour shifts, and he no longer received the regular built-in overtime pay that he had received as an AUO.[47] Before he reassigned plaintiff to guard shack duty, Coffey did not discuss with plaintiff the efforts plaintiff had made to schedule an appointment with his private physician.[48]

Dr. Rhett Murray, a neurologist, examined plaintiff on July 28, 2005 and determined that he suffered radiculopathy due to spondylosis at his cervical vertebrae.

---

[45]*Id.* at 1-2.

[46]Coffey Deposition, at 68-73; Appleton Deposition, at 208.

[47]Coffey Deposition, at 71-73, 125-26.

[48]Coffey Deposition, at 69.

Dr. Murray recommended surgery to treat plaintiff's condition.  Dr. Murray also placed plaintiff on modified work duty, including no lifting, dragging, pushing, or pulling more than 30 pounds, and no firefighting.  Plaintiff could perform all other physical job requirements listed on the form, including bending, climbing, crawling, crouching, handling, kneeling, reaching above shoulder height, twisting, and walking, except that he was directed to stop these activities if he experienced pain.[49]  Plaintiff presented Dr. Murray's report to TVA management on approximately August 1, 2005, and he was examined by a TVA physician on August 5, 2005.  After his TVA examination, plaintiff's medical constraints were changed from "no overhead work" to "reaching limited by pain only."[50]  On or about August 8, 2005, TVA reviewed plaintiff's modified medical constraints and reassigned plaintiff to his AUO position. Plaintiff once again began working rotating twelve-hour shifts.[51]

### III.  DISCUSSION

Plaintiff's disability discrimination claims arise under the Rehabilitation Act, which prohibits federal agencies from discriminating against otherwise qualified individuals with a disability.  *See, e.g., Mullins v. Crowell,* 228 F.3d 1305, 1313 (11th

---

[49]Appleton Deposition, at 119-21; defendant's evidentiary submission, Tab 18 (Exhibit 4 to Appleton Deposition).

[50]Plaintiff's Response to Defendant's First Request for Admissions, at 4-5 (Response to Request No. 13).

[51]Plaintiff's Response to Defendant's First Request for Admissions, at 5 (Response to Request No. 14); Appleton Deposition, at 123-24.

Cir. 2000); *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999).[52]  "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases. . . ."  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)) (footnote omitted); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).  Thus, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice versa*."  *Cash*, 231 F.3d at 1305 n.2 (citing *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 n.2 (11th Cir. 1996)).

## A.   Circumstantial Evidence of Disability Discrimination

Under either the Rehabilitation Act or the ADA, plaintiff must prove that his employer intentionally discriminated against him because of his disability.  "In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA [or Rehabilitation Act] violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases."  *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see also, e.g., Hilburn v. Murata Electronics North America, Inc*., 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.") (citing

---

[52]*See also* 42 U.S.C. § 12111(5)(B) (stating that the United States and its agencies are excluded from coverage under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.).

*Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)).

To establish a *prima facie* case of disability discrimination, plaintiff must demonstrate:  (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he can perform the essential functions of the employment position he holds or seeks, with or without reasonable accommodation being made by the employer;[53] and (3) that he suffered an adverse employment action because of his disability.  *See, e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

Plaintiff cannot establish a *prima facie* case because he cannot show that he has a "disability" within the meaning of the Rehabilitation Act.  The Act defines the concept of "disability" three ways — that is, as including any person: (A) who has a "physical or mental impairment" that "substantially limits" one or more of the "major life activities" of such person; or (B) who has a "record" of such an impairment; or

---

[53]*See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

(C) who is "regarded" as having such an impairment.  42 U.S.C. § 12102(2); *see also* 29 C.F.R. § 1630.2(g).  "An individual is deemed to be 'disabled' for purposes of the ADA [or Rehabilitation Act] if he satisfies any one of these three enumerated definitions."  *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

### 1.    "Substantially Limits"

Plaintiff first claims that he has physical impairments that substantially limit the major life activities of sleeping, driving, standing, and engaging in sexual activity. Defendant does not contest that plaintiff has "impairments" within the meaning of the Rehabilitation Act.[54]  Defendant argues, nonetheless, that plaintiff is not disabled because his impairments do not substantially limit any major life activity.

"The regulations interpreting the Rehabilitation Act of 1973 define major life activities as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'   45 C.F.R. § 84.3(j)(2)(ii).   If not contained within these exemplars, the activity must be 'significant' to everyday life."  *Rossbach v. City of Miami,* 371 F.3d 1354, 1357 (11th Cir. 2004) (citing *Bragdon v. Abbott,* 524 U.S. 624, 638 (1998)) (footnote omitted).

---

[54]Doc. no. 16 (defendant's initial brief), at 24 ("TVA does not dispute for purposes of this motion that Plaintiff's medical conditions of cervical spondylosis and thoracic scoliosis constitute impairments within the meaning of the statute.").

The Eleventh Circuit has held that "driving is not a major life activity for purposes of the ADA" or the Rehabilitation Act.  *Collado v. United Parcel Service Co.,* 419 F.3d 1143, 1157-58 (11th Cir. 2005) (citing *Chenoweth v. Hillsborough County,* 250 F.3d 1328, 1329 (11th Cir. 2001)).   On the other hand, sleeping, standing, and engaging in sexual activity do constitute "major life activities."  *See Bragdon,* 524 U.S. at 638 ("Reproduction falls well within the phrase 'major life activity.' Reproduction and the sexual dynamics surrounding it are central to the life process itself."); *Rossbach,* 371 F.3d at 1357-58 (considering sleeping and standing as major life activities).

The court must next determine whether plaintiff's "major life activities" of sleeping, standing, and engaging in sexual activity have been "substantially limited." Plaintiff claims that he is substantially limited in sleeping because he gets no more than four hours of sleep each night due to his neck pain.  He can endure this sleep schedule for about two to five weeks, after which he has to spend approximately forty-eight hours of his time off work napping intermittently to catch up on sleep. Plaintiff also stated in his interrogatory responses that if he stands in one place, his neck will start to hurt.[55]  He clarified at his deposition that he feels neck pain if he stands still or in a slow-moving line for more than ten minutes at a time.  Shifting his

---

[55]Plaintiff's Supplemental Response to Defendant's First Interrogatories, at 2.

body position or speeding to a walking pace will alleviate the pain.[56]  Finally, plaintiff

cannot engage in certain sexual positions due to neck pain.  Specifically, he stated,

"I am precluded from certain positions during sex.  If the sex partner is on top it is

O.K.  If I am in the rear position its [sic] O.K.  If I am in any other position I would

get a sharp pain in my neck and loose [sic] my erection."[57]

These circumstances do not reflect "substantial" limitations on any major life

activity.  The relevant federal regulations

> define "substantially limits" as rendering an individual "[u]nable to
> perform a major life activity that the average person in the general
> population can perform" or "[s]ignificantly restricted as to the condition,
> manner or duration under which an individual can perform a particular
> major life activity as compared to the condition, manner, or duration
> under which the average person in the general population can perform
> that same major life activity."  The regulations also discuss three factors:
> (1) the nature and severity of the impairment; (2) the duration or
> expected duration of the impairment; and (3) the permanent or long term
> impact, or the expected permanent or long term impact of or resulting
> from the impairment.

*Chanda v. Engelhard/ICC,* 234 F.3d 1219, 1222 (11th Cir. 2000) (citing 29 C.F.R.

§§ 1630.2(j)(1)(i), (ii); 1630.2(j)(2)) (bracketed alterations in original).  An individual

who performs a major life activity "moderately below average," or who experiences

merely a "diminished activity tolerance" for a certain activity, is not disabled under

---

[56]Appleton Deposition, at 35-37.

[57]Plaintiff's Supplemental Response to Defendant's First Interrogatories, at 2.

the Rehabilitation Act. *Rossbach,* 371 F.3d at 1358; *Hilburn,* 181 F.3d at 1227-28.

Here, the limitations resulting from plaintiff's impairments are no more than "moderately below average." The Eleventh Circuit has recognized that, because "[d]ifficulty sleeping is extremely widespread," it is not a "substantial limit" on a major life activity unless the "affliction is any worse than is suffered by a large portion of the nation's adult population." *Rossbach,* 371 F.3d at 1358 (citing *Colwell v. Suffolk County Police Department,* 158 F.3d 635, 644 (2d Cir. 1998)). In a recent, unpublished opinion, a panel of the Eleventh Circuit held that a plaintiff who averaged five and a half to six hours of sleep per night did not have a sleep-based disability. *Nadler v. Harvey,* No. 06-12692, 2007 WL 2404705 (Aug. 24, 2007) (slip copy). The panel noted that other circuit courts of appeal "have found plaintiffs sleeping as little as two and a half hours at a time and as little as four and a half hours a night not to be substantially impaired." *Id.* at *6 (citing *Burks v. Wisconsin Dept. of Transportation,* 464 F.3d 744, 755 (7th Cir. 2006) (sleeping no more than three hours was not a substantial limitation); *Nuzum v. Ozark Automotive Distributors, Inc.,* 432 F.3d 839, 848 (8th Cir. 2005) (sleeping no more than two and a half hours at a time and five hours a night was not a substantial limitation); *Swanson v. Univ. of Cincinnati,* 268 F.3d 307, 314 (6th Cir. 2001) (sleeping less than five hours was not a substantial limitation)). This court is persuaded by the reasoning of the decisions

cited by *Nadler.*  The court therefore concludes that plaintiff's ability to sleep is no more than "moderately below average," and that he consequently is not substantially limited in the major life activity of sleeping.  This conclusion is reinforced by the fact that plaintiff has been able to cope with his four-hour-per-night sleep schedule for years by catching up on sleep during his off-time.

Plaintiff's ability to stand and his ability to engage in sexual activity also are not substantially limited.  Plaintiff does not allege that he is *unable* to stand, just that standing more than ten minutes causes him neck pain.  Further, plaintiff only experiences pain if he stands absolutely still; shifting positions or walking alleviates the pain.  Similarly, plaintiff still is able to engage in sexual activity; his only limitation is in the number of sexual positions he can assume.  Although plaintiff does experience a "diminished activity tolerance" for standing and sexual activity, the court concludes his limitations are not significantly more restrictive than those endured by the general population.  *See Chanda,* 234 F.3d at 1223 (plaintiff was not substantially limited in the major life activity of performing manual tasks when she was unable to perform a "narrow category" of manual tasks, but could perform a "range" of other manual tasks).

Based on the foregoing, plaintiff is not substantially limited in any major life activity.

### 2.    "Regarded as" having a disability

Plaintiff also argues that TVA regarded him as having a disability covered by the Rehabilitation Act.  The Eleventh Circuit has explained the workings of the "regarded as" definition of "disability" as follows:

> A plaintiff is "regarded as" being disabled if he meets one of three conditions:  (1) *he has a physical impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation*; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or (3) has no physical or mental impairment but is treated by an employer as having such an impairment. . . . Our Court has held that, for a plaintiff to prevail under this theory, he must show two things:  (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is "substantially limiting" and significant.

*Rossbach,* 371 F.3d at 1359-60 (citing *Sutton,* 185 F.3d at 1209) (emphasis supplied).

*See also* 29 C.F.R. § 1630.2(*l*) (defining "regarded as having such an impairment").

In any event, the employer must

> entertain misperceptions about the individual — it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.  These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." *See* 42 U.S.C. § 12102(7).

*Sutton v. United Air Lines*, *Inc*., 527 U.S. 471, 489 (1999) (emphasis supplied, other alterations in original).

To support his claim that he was "regarded as" having a disability, plaintiff states only that he "presented sufficient evidence from which a reasonable jury could find that, because of this perceived impairment, TVA's management considered him an 'individual with a disability.'"[58]   The court disagrees, and finds plaintiff's conclusory argument insufficient.   *See Rossbach,* 371 F.3d at 1359 (testimony "couched in vague terms and unaccompanied by any evidence" was insufficient to prove a disabling impairment); *Hilburn*, 181 F.3d at 1227-28 (conclusory allegations of a disabling impairment, without sufficient supporting facts, were insufficient). TVA no doubt perceived plaintiff as having *some* type of impairment, given that it assigned him medical constraints.  Even so, there is no evidence that anyone at TVA perceived plaintiff as having an impairment that would *substantially limit* a *major life activity*.  Indeed, Dewayne Coffey testified that he did not consider plaintiff to have a "disability," as he understood the legal definition of that term.[59]  Further, plaintiff testified in his deposition that he did not think that anybody at TVA perceived him as being disabled, and that no one ever told him they thought he was disabled.[60] Accordingly, the court concludes plaintiff was not regarded as having a disability under the Rehabilitation Act.

---

[58] Doc. no. 22 (plaintiff's brief), at 20.

[59] Coffey Deposition, at 47.

[60] Appleton Deposition, at 73.

### 3.      "Record of" a disability

Plaintiff also claims that TVA has a record of his disability, in the form of his documented medical constraints.  "The relevant regulation defines 'record of such impairment' as meaning that a person 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  *Hillburn,* 181 F.3d at 1229 (citing 29 C.F.R. § 1630.2(k) (1997)).

> [T]he record-of-impairment standard is satisfied only if [the plaintiff] actually suffered a physical impairment that substantially limited one or more of [his] major life activities.  "The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities."

*Hillburn,* 181 F.3d at 1229 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997)) (other citations omitted).

Plaintiff asserts that his pre-August-2005 medical constraints — *i.e.*, no working overhead; no lifting more than 20 pounds; and no pushing or pulling more than 25 pounds — constitute TVA's record that he has substantial limitations on the major life activities of performing manual tasks, lifting, and reaching.  The court disagrees, as the pre-August-2005 constraints do not reflect that plaintiff is *substantially* limited in any of these activities.  In fact, even under those constraints, plaintiff can perform *all* manual tasks, as long as they do not involve exerting more than 20 to 25 pounds of force.  He can lift anything weighing twenty pounds or less,

-26-

and he can reach in any direction except overhead.  Therefore, the court concludes that, while plaintiff's pre-August-2005 medical constraints reflect a *somewhat* diminished tolerance for performing manual tasks, lifting, and reaching, they do not reflect that he is *significantly* restricted in his ability to perform these tasks in comparison with the general population. *See, e.g., Carr v. Publix Supermarkets,* 170 Fed. Appx. 57, at 60 n.3 (11th Cir. 2006) ("[W]e doubt that a lifting limitation states a *per se* ADA disability); *Nuzum,* 432 F.3d at 646 (noting that, although certain motor functions, including lifting, are designated as major life activities, "a finding of disability depends not on whether the plaintiff can perform every one of those functions, but on whether the net effect of the impairment is to prevent or severely restrict the plaintiff from doing the set of activities that are 'of central importance to most people's daily lives'"); *Chanda,* 234 F.3d at 1222-23 (individual who could not type or perform repetitive cutting motions — but who could dress himself, drive, take written notes, and use a computer — was not substantially limited in the major life activity of performing manual tasks). Accordingly, plaintiff does not have a record of a disabling impairment under the Rehabilitation Act.

Based on all of the foregoing, plaintiff does not have a "disability" within the meaning of the Rehabilitation Act.  Consequently, he cannot satisfy his *prima facie* case of disability discrimination, and he cannot prove a claim for disability

discrimination based upon circumstantial evidence.[61]

## B.     Claim for an Impermissible Medical Examination

Plaintiff also claims that TVA violated the Rehabilitation Act by requiring him to undergo an examination by his treating physician in order to update his medical constraints.  *See* 42 U.S.C. § 12112(d)(4).  Plaintiff did not raise this claim in the administrative complaint he filed with the EEOC, he did not mention it in the complaint he filed in this case, and he did not identify it in response to TVA's interrogatory requesting him to describe the basis of his claims.  Instead, plaintiff argued in *all* of these documents that he was discriminated against when he was transferred from a 12-hour shift to an 8-hour shift from approximately October 17, 2004 to August 8, 2005.[62]

Plaintiff cannot raise a claim for the first time in response to a motion for

---

[61]Because plaintiff does not have a "disability" under the Rehabilitation Act, the court need not address his arguments that he is a qualified individual with a disability, and that TVA discriminated against him by failing to reasonably accommodate his disability and by reassigning him to guard shack duty.

[62]*See* doc. no. 8, Attachment 1 (July 27, 2006 Notice of Dismissal on Complaint of Discrimination from TVA), at 1 ("The issue accepted for investigation was Complainant's allegation that he was discriminated against because of his . . . physical disability (herniated disc in neck) . . . when he was moved from a 12-hour shift to an 8-hour shift at Colbert Fossil Plant from on or about October 17, 2004 through August 8, 2005."); doc. no. 1 (Complaint), at ¶¶ 7-9 (factual allegations of plaintiff's complaint, consisting of a quote from the EEOC's acceptance of issues for investigation); defendant's evidentiary submission, Tab 1 (Plaintiff's Response to Defendant's First Interrogatories), at 2 (response to Interrogatory No. 1) (when asked to describe TVA's discriminatory acts, plaintiff stated, "From October 17, 2004 to August 8, 2005 I was taken off my 12 hour regular shift work and placed on day shift 8 hours, due to a [sic] management's perception that I was handicapped from a previous job related injury").

summary judgment.  *See Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ.P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citation omitted).  *See also Crawford v. Babbitt,* 186 F.3d 1322, 1326 (11th Cir. 1999) ("A federal employee must pursue and exhaust her administrative remedies as a jurisdictional prerequisite to filing a Title VII action.") (citation omitted).[63]  Plaintiff's claim for an impermissible medical examination is due to be dismissed on that basis alone.

Even if plaintiff had properly raised his claim for an improper medical examination, the claim still could not proceed past summary judgment.  The ADA does state that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability."  42 U.S.C. § 12112(d)(4)(A).  The statute permits such an examination or inquiry, however, if it is "shown to be job-related and consistent with business necessity."  *Id.*  The statute

---

[63]An ADA or Rehabilitation Act plaintiff must satisfy the same administrative prerequisites to filing suit as a plaintiff suing under Title VII of the Civil Rights Act of 1964.  *See Zylette v. Capital One Financial Corp.,* 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964.").

also allows an employer to "make inquiries into the ability of an employee to perform job-related functions."  42 U.S.C. § 12112(d)(4)(B).[64]

TVA's request for medical information from plaintiff centered around plaintiff's ability (or inability) to perform job-related functions.  TVA required plaintiff to present sufficient medical information for it to determine the extent of his medical constraints.  The medical forms presented to Dr. Murray, who eventually examined plaintiff, contained a summary of the physical requirements of plaintiff's job.  Once TVA received the requested information from Dr. Murray and determined his medical constraints, TVA evaluated the constraints to determine whether plaintiff could perform all the functions of his job as AUO.  There is no evidence that TVA made any request for medical information that was unrelated to plaintiff's ability to perform the duties of his job, nor is there any other evidence that the requests were made for discriminatory reasons.

### IV. CONCLUSION AND ORDER

The court concludes that there are no genuine issues of material fact remaining for trial, and that defendant is entitled to judgment as a matter of law on plaintiff's

---

[64]The Rehabilitation Act incorporates by reference these provisions of the ADA.  *See* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.").

remaining claim for disability discrimination.  Accordingly, defendant's motion for

summary judgment is GRANTED.  All claims of plaintiff are DISMISSED with

prejudice.  Costs are taxed as paid.  The clerk is directed to close this file.

DONE this 25th day of March, 2008.

_____
United States District Judge